**FIRST NAT. BANK OF SCHULENBURG, TEX., v. WINKLER et al.**

**No. 8941.**

Court of Civil Appeals of Texas. Austin.

Nov. 20, 1940.

Rehearing Denied Dec. 31, 1940.

202

Edward S. Boyles and Willard L. Russell, both of Houston, and Fred L. Blundell, of Lockhart, for appellant.

J. W. Ragsdale, of Victoria, for appellees.

BAUGH, Justice.

Appellees, Joe Winkler and Charles Ulrich, for themselves, and for the use and benefit of 33 farmers of Fayette County, brought this suit against appellant bank to recover $2,752 alleged to be a trust fund belonging to them, deposited in Winkler's name with said bank; and which the bank had applied to the payment of Winkler's debt to it. Trial was to a jury on special issues. The jury was unable to agree upon answers to such issues and were discharged. Thereupon both plaintiffs and the defendant filed motions for judgment. That of the defendant was overruled; that of plaintiffs granted; and judgment rendered for the plaintiffs for $2,273, from which the bank has appealed.

The case arose as follows: Winkler had owned and operated a cotton gin in a rural area in Fayette County for a number of years, and had bought cotton from his patrons, under an agreement with E. H. Pratka at Schulenburg. Winkler paid for it with checks drawn on his own account with appellant bank. This cotton was then taken off Winkler's hands by Pratka, who deposited the purchase price therefor, according to their agreement, made known to the bank, to the credit of Winkler in said bank. It is not controverted that Winkler's account with the bank was carried as a general deposit, and was so treated by the bank. Credited to it were all moneys deposited by Winkler, from whatever source received; and against it were charged all

checks drawn by Winkler to whomsoever payable. The deposits made included all of Winkler's income from his farm, ginning charges, receipts from sale of cotton seed to an oil mill, which seed were also purchased from patrons and paid for by his personal checks on the same account. Checks were drawn by Winkler on this account for all purposes, including operating expenses of his gin, his farm, his family living expenses, labor hire, materials purchased, etc. In brief, the evidence showed that Winkler had carried this same account with said bank for a period of 20 years, had deposited all moneys received by him in said account, and had drawn all checks written by him for all purposes against it.

■ Under these circumstances, it was clearly incumbent upon the plaintiffs to show that, contrary to the manner in which the account was carried by the bank, and treated by Winkler, the moneys here involved became a trust fund in the bank's hands, belonging to the farmers to whom Winkler had given checks, and that the bank knew, or should have known, this at the time it applied such funds to the payment of Winkler's debt to it, on August 28, 1937.

■ There is no contention, and can be none under now settled law, that the bank had the right to apply the funds on deposit with it belonging to Winkler to the payment of his past-due indebtedness to it (6 Tex.Jur. § 100, p. 232, and cases cited in support of the text); unless such funds constituted a special deposit, or were impressed with a trust, of which the bank had, or should have had, knowledge, for the benefit of some party or parties other than Winkler.

The contention of appellees is that under the agreement between Pratka and Winkler, made known to, and consented to by the bank, the deposits made by Pratka in the bank to the credit of Winkler, made such funds the property or moneys of the farmers themselves, to whom Winkler had given checks, and as such the bank became merely the trustee thereof for such farmers and could not legally divert such funds in its hands to the payment of Winkler's debt.

The case was tried on this theory and the following special issue, obviously requested by plaintiffs, appellees here, submitted to the jury: "Do you find from a preponderance of evidence that the deposits made in the First National Bank of Schulenburg, Texas, in the ginning season of 1937, by E. H. Pratka, to be credited to the account of Joe Winkler, were accepted by the bank with the understanding on its part that said funds were to be held for the particular purpose of paying checks issued by Joe Winkler in payment for cotton purchased from his gin patrons? Answer yes or no."

■ The jury failed to agree upon an answer to this question. Unless, therefore, the evidence showed as a matter of law, that it should have been answered Yes, the trial court erred in rendering judgment for plaintiffs.

Only two witnesses, Winkler and Pratka, testified on this question. Winkler's testimony, covering the particular point, as to his agreement with Pratka, and the bank's connection with it, was (quoting only pertinent excerpts) as follows:

"I got the market price from him as to what I was to pay for the cotton; I bought the cotton, and Mr. Pratka came over and got it himself in his truck, and I would give him an invoice for the cotton at the price I bought it, and he deposited the money in the First National Bank to cover it."

"Q. Did you tell the officers of the bank about this agreement? A. Yes sir, we told the officials at the First National Bank that I was buying this cotton ginned at my gin and that Pratka was going to pay for it."

On cross-examination he testified:

"Q. I wish you would tell me again what it was that you told Crumsek, what words did you use in telling him of this agreement? A. That I was going to buy cotton for Pratka, and that he was going to put the money in the bank, and that it belonged to the farmers.

"Q. You were going to buy cotton for Pratka, and Pratka was going to put the money in the bank to pay the checks, is that it? A. Yes sir.

*    *    *    *    *    *

"Q. You don't mean to say by your testimony that each time a bale was bought that Mr. Pratka made a deposit for that particular bale? A. No sir.

"Q. Sometimes it would accumulate until you had several bales on hand? A. Yes sir.

"Q. Isn't it true that as to each deposit that Mr. Pratka made that you personally made out the deposit slips for Mr. Pratka to deposit to your account? A. Yes sir.

"Q. And he gave the deposit slips to the bank together with his check for the amount of the deposit? A. Yes, sir."

Pratka's pertinent testimony with regard to the issue in question was as follows:

"We went to the First National Bank every year, and as I recall Mr. Winkler went with me a couple of times at least—I went to the bank and told the officials of the bank, the entire crew generally, Mr. Steinman and Mr. Crumsek, being among them as I recall, that Joe Winkler had agreed to buy cotton within my limits at the market price, and that afterwards I was to take it off his hands at his cost regardless of the market. We did that every year.

"Q. How was it paid? A. With his check.

"Q. That was discussed with the bank? A. Yes sir.

"Q. How were these checks to be drawn? A. Joe Winkler paid for the cotton with his own check, and in turn I was to take the cotton off his hands, and pay for it with my check deposited in the bank in his account after I received the invoice for it or the cotton.

"Q. What did the bank officials say when you told them of this arrangement? A. They just nodded their heads.

"Q. That agreement was satisfactory with the bank? A. Yes sir."

On cross-examination he further testified:

"Q. Isn't it a fact that boiled down the agreement was that you would buy the cotton from Joe Winkler that he had bought from the people ginning at his gin? A. Yes sir.

"Q. And that if and when he had delivered you this cotton or sent you an invoice you made out check for the cotton to Joe Winkler? A. Yes sir, after I had checked the invoice and saw that the cotton was there, then I made a check in favor of Joe Winkler.

"Q. And the only other connection you had with the transaction was seeing that the money you owed him for the cotton got into his account at the bank? A. Yes sir.

"Q. He wasn't your agent? A. No sir.

"Q. Who he bought the cotton from was his business? A. Yes sir.

"Q. Your only concern was that if he bought the cotton and delivered it to you, you were to pay him for it? A. Yes sir.

"Q. Did it make any difference to you how he ran the account? A. No sir.

"Q. It mattered not to you if he paid his living expenses out of it? A. No sir.

"Q. Your transaction or connection with the matter ended when you deposited the money in the bank for Joe Winkler's account for the cotton he sold to you? A. Yes sir.

"Q. If there was any variance in classing or weighing the cotton you made a deduction from your check or had an adjustment with him later? A. Yes sir.

"Q. You say you don't remember the date, but assuming that his account was closed on the 28th of August, 1937, after some of these checks were turned down, did some of these parties come to you? A. Yes sir, they came to me to ask what were they going to do about it.

"Q. And you told them that Joe Winkler bought the cotton and whatever redress they had to get it from him? A. Yes sir.

"Q. It was none of your concern? A. No sir.

On redirect examination he further testified:

"Q. You did not send or give Joe Winkler individually the money for this cotton, but deposited in his name in the bank? A. Yes sir.

"Q. Why were you depositing that in the bank? A. Because of the verbal agreement we had between Joe Winkler and myself and the bank naturally, because he had issued checks against this account.

"Q. And the bank knew that? A. Yes, sir, I told them I was going to buy Joe Winkler's cotton."

It is the contention of appellees that the foregoing testimony, which was not denied nor controverted by any of the officers of the bank, though they were present at the trial and could have contradicted it if untrue, shows, under the holding of the Supreme Court in Steere v. Stockyards National Bank, 113 Tex. 387, 256 S.W. 586, 258 S.W. 1042, as a matter of law that the funds deposited by Pratka to the credit of Winkler in said bank, were deposited for the express purposes of paying the farmers from whom Winkler had bought cotton and to whom he had theretofore given his checks in payment; and that the bank knew and had agreed to such an arrangement. Consequently, that to the extent of Pratka's deposits, the funds carried to

Winkler's credit in the bank, were trust funds, regardless of how the bank carried the account, what other funds were commingled with it, and what other checks Winkler may have drawn against it. If they were, then the bank wrongfully misappropriated such funds to that extent when it applied same to the payment of Winkler's personal indebtedness to it.

Most of appellant's propositions relating to deposits, the relation of the bank thereto, and to the depositor, undoubtedly state correct principles of law. Such for example, that a general deposit merely creates the relation of debtor and creditor between the bank and the depositor; that a bank may apply such deposit to the discharge of a past-due debt by the depositor to the bank; that checks on such account are not an assignment pro tanto of the moneys on deposit and are not binding on the bank until accepted by it; that a bank, to be bound, must have notice of and accept a trust deposit with it; that generally the bank is trustee only of a special deposit; and that where the depositor has an unlimited checking privilege, even as against a special or trust deposit, the bank is not liable for his conversion or misappropriation of it.

Under the undisputed testimony it is undoubtedly true that Winkler could have checked out to others than those from whom he bought cotton the entire fund carried in his name without the bank becoming liable to the farmers, unless such misapplication by Winkler were known, or should have been known, to the bank. In such case the misapplication of the fund would have been by Winkler, not participated in by the bank. See Interstate National Bank v. Claxton, 97 Tex. 569, 80 S.W. 604, 65 L.R.A. 820, 104 Am.St.Rep. 885. But where a bank has on deposit with it a fund, all or a part of which is known by it to be impressed with a trust character, and with such knowledge undertakes to apply the whole of such fund to the discharge of the depositor's debt to it, it thereby becomes a party to the misapplication thereof as against the fiduciaries, and can no longer assert immunity from liability for its wrongful act. Steere v. Stockyards National Bank, supra; Wichita Royalty Co. v. City National Bank, 127 Tex. 158, 89 S.W.2d 394, 399, 93 S.W.2d 143. Such, we think, is the situation here presented.

Neither the manner in which Winkler's account with the bank was carried by it, nor the fact that other funds of his were commingled with those deposited by Pratka, relieves the bank from liability for its misapplication of such trust funds. It knew of, and agreed to, the arrangement between Pratka and Winkler; and undoubtedly knew that the funds deposited by Pratka were necessary and intended for the payment of the checks issued by Winkler to the farmers in payment of their cotton. Otherwise there would have been no occasion for Pratka and Winkler to go to the bank, apprise them of their arrangement, and obtain the bank's consent to it.

Not having contradicted the testimony of the agreement, when the officers of the bank, present at the trial, could have readily done so, but did not, we must assume that such agreement was made, even if it be deemed to have been proven only by interested witnesses, which was clearly not true as to the witness Pratka. See Luling Oil & Gas Co. v. Edwards, Tex.Civ. App., 32 S.W.2d 921; 17 Tex.Jur. § 418, p. 926.

A portion of the fund at least having been thus impressed with a trust, it became the duty of the bank before it could apply any of such fund or deposit toward the discharge of the depositor's debt to it, to segregate the portion not so impressed with a trust from that which was. But in the instant case the recovery awarded was confined to the deposits shown to have been made by Pratka for payment only of cotton checks to the farmers, so the bank is in no position to complain.

While there are some distinctions between the facts in the instant case and those in the Steere case, in that, in the Steere case, Graves, the depositor, and not the bank, was held to be the trustee; whereas, here, it is asserted that the bank, rather than Winkler, was the trustee; we think the principles announced in the Steere case are controlling here. Both in that case and here, the bank with knowledge of the facts was undertaking to discharge a debt owing to it by a depositor with funds deposited with it in the debtor's name, but which in equity belonged to someone else. The controlling principles are therefore the same. Having concluded that this case is conclusively ruled by Steere v. Stockyards National Bank, supra, regardless of decisions from other jurisdictions cited and urged by appellant as holding otherwise; we have not undertaken to discuss the several contentions made

by appellant, nor the authorities relied upon by it in support thereof.

Finding no reversible error in the record, the judgment of the trial court is affirmed.

Affirmed.